**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

STEPHANIE HUGHES-QUAIN,      :

      :      Civil Action No.:  **3:23-cv-214 (TJM/ML)**

      Plaintiff,      :

      :

      v.      :      **COMPLAINT**

      :

VISIONS FEDERAL CREDIT UNION      :

f/k/a IBM EMPLOYEES FEDERAL CREDIT      :      **Jury Trial Demanded**

UNION and RICHARD SCOTT, in his individual      :

and professional capacities,      :

      :

      Defendants.      :

---------------------------------------------------------- X

Plaintiff Stephanie Hughes-Quain ("Plaintiff" or "Ms. Hughes-Quain") brings this complaint against Visions Federal Credit Union f/k/a IBM Employees Federal Credit Union ("VFCU" or the "Credit Union") and Richard Scott ("Mr. Scott") (together, "Defendants"), and hereby alleges as follows:

## PRELIMINARY STATEMENT

1.  In the late 1980s, decades before the #MeToo era, Ms. Hughes-Quain worked at the Credit Union where a "boys will be boys" permissive attitude prevailed.  During this time, Defendant Scott abused his power as an executive at VFCU to sexually harass and assault Ms. Hughes-Quain with impunity and without fear of any repercussions.

2.  Ms. Hughes-Quain began working at VFCU as a teller when she was just 22 years old and still in college.  She was living independently from her parents and relied on her job with the Credit Union to pay her bills and put food on the table.

3.  Armed with this knowledge, Defendant Scott began targeting Ms. Hughes-Quain, first by stalking her and then by assaulting her on multiple occasions.

1

4.      Ultimately, Ms. Hughes-Quain reported the harassment to Human Resources ("HR"), but her complaint was not taken seriously.  Ms. Hughes-Quain was relocated, but Defendant Scott did not face any consequences.  Instead, Defendant Scott felt emboldened by the lack of any repercussions and visited Ms. Hughes-Quain at her new branch to intimidate her. When Ms. Hughes-Quain saw that the Credit Union was not willing to provide her with a safe work environment, she had no choice but to give up her job.

5.      Years later when Ms. Hughes-Quain's path again crossed with Defendant Scott, she questioned him about the assaults.  Defendant Scott callously remarked that his unlawful and violent attacks were merely "water under the bridge," and disregarded Mr. Hughes-Quain.

6.      For decades, Defendants VFCU and Scott have avoided liability for their actions, but now, pursuant to the Adult Survivor's Act, Ms. Hughes-Quain seeks to hold them both accountable for the severe emotional distress she suffered and continues to suffer.

7.      The unlawful assault, sexual harassment and discrimination described herein was committed in violation of the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et. seq.* ("NYSHRL") and New York State common law.

## JURISDICTION AND VENUE

8.      The District Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a).  The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

9.      Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to this case occurred in the Northern District of New York.  Plaintiff was employed at all relevant times in this District, and the acts alleged herein occurred in this District.

## PARTIES

10.     Plaintiff Stephanie Hughes-Quain is a former employee of VFCU.  At all relevant times, Ms. Hughes-Quain worked at the VFCU branches in Endicott, New York.  Ms. Hughes-Quain is a resident of the State of Georgia and, at all relevant times herein, met the definition of "employee" under the relevant statutes.

11.     Defendant Visions Federal Credit Union is a federally chartered credit union with its principal office in Endicott, New York.  At all relevant times, Visions Federal Credit Union met the definition of an "employer" under the relevant statutes.

12.     Defendant Richard Scott was the Chief Information Officer of VFCU.  At all relevant times, Mr. Scott worked at the Endicott, New York office of the Credit Union.  Mr. Scott is a resident of the State of Florida and, at all relevant times here, was Ms. Hughes-Quain's supervisor.

## FACTUAL ALLEGATIONS

## I.     MS. HUGHES-QUAIN STARTS WORKING AT VFCU AND MEETS MR. SCOTT

13.     In September 1987, Ms. Hughes-Quain was a 22-year-old college student at Binghamton University when she began working at VFCU in Endicott, New York as a teller.

14.     At the time, Ms. Hughes-Quain reported to the branch manager in Endicott.

15.     In 1987, the VFCU corporate office was in the same building as the Endicott branch.

16.     Defendant Scott worked in the corporate office and occasionally came into the Endicott branch.

17.     In early 1988, Defendant Scott came to the teller lines of the Endicott branch and began having conversations with Ms. Hughes-Quain.  Ms. Hughes-Quain conversed with Defendant Scott out of courtesy and because he was a member of VFCU's C-suite.

18.     On one occasion, Defendant Scott offered Ms. Hughes-Quain tickets to a hockey game.  Ms. Hughes-Quain accepted the two tickets and attended the game with her boyfriend at the time.

19.     At the game, Ms. Hughes-Quain saw Defendant Scott and another VFCU C-suite executive named Joe.  Between the periods she chatted with Defendant Scott and Joe.

## II.     MR. SCOTT STALKS MS. HUGHES-QUAIN

20.     Shortly thereafter, Defendant Scott began to appear at the Endicott branch more and more frequently, and he would come to Ms. Hughes-Quain's teller line for no reason other than to see and interact with Ms. Hughes-Quain.

21.     These interactions made Ms. Hughes-Quain uncomfortable because she was only interested in maintaining a professional relationship with her colleagues and managers at work.

22.     Defendant Scott, however, used his position as an executive at VFCU to inappropriately access Ms. Hughes-Quain's personnel file and determined that she was attending Binghamton University.  The fact that Ms. Hughes-Quain was a student at Binghamton University was included in her personnel file because she was enrolled in the Credit Union's tuition reimbursement program.

23.     In April 1988, Defendant Scott, who had learned what classes Ms. Hughes-Quain was taking from the information in her personnel file, showed up outside the building where Ms. Hughes-Quain attended class at Binghamton University.  When Ms. Hughes-Quain walked out

4

of her class, she saw Defendant Scott leaning against his car which was parked in the round-about outside the building.

24.     Ms. Hughes-Quain was petrified to see one of the executives from her place of employment waiting for her outside of class.

25.     Defendant Scott asked that Ms. Hughes-Quain go for a ride with him in his car. Ms. Hughes-Quain felt compelled to accede to the demand made by the CIO of her employer.

26.     The drive lasted about 45 minutes as Defendant Scott drove towards Cortland and back.  During the drive, Defendant Scott told Ms. Hughes-Quain about his wife and three daughters.  The conversation was awkward, and Ms. Hughes-Quain remembers just wanting to get back to campus and get home safely.

III.    **MR. SCOTT RAPES MS. HUGHES-QUAIN FOR THE FIRST TIME**

27.     Shockingly, approximately one or two weeks after showing up outside Ms. Hughes-Quain's class, at approximately 10:00 p.m., Defendant Scott appeared at Ms. Hughes-Quain's apartment.

28.     Ms. Hughes-Quain had not given Defendant Scott her address or advised him where she lived.

29.     Ms. Hughes-Quain was extremely anxious that Defendant Scott knew where she lived and that he appeared at her home unannounced.  This was particularly alarming to Ms. Hughes-Quain because she lived in an upstairs apartment unit of a renovated house.  Her apartment door was in the back of the house along with one other unit.  Ms. Hughes-Quain was frightened even more by the fact that Defendant Scott knew which apartment was hers.

30.     Defendant Scott knocked on Ms. Hughes-Quain's door.  Ms. Hughes-Quain was getting ready for bed and was already in her pajamas.  Her boyfriend at the time had left her

apartment shortly before Defendant Scott knocked on her door. When she heard the knock, she went to see who was there. Ms. Hughes-Quain turned on the light outside her apartment door and was shocked and terrified to see Defendant Scott waiting outside. Ms. Hughes-Quain could not comprehend why VFCU's CIO was at her home at all, but especially at such a late hour.

31.     Through the viewing pane, Defendant Scott signaled for Ms. Hughes-Quain to open the door. Reluctantly, Ms. Hughes-Quain opened the door and said that it was late and asked why Defendant Scott was there.

32.     Defendant Scott responded that he wanted to come by and see her. Ms. Hughes-Quain was shaking and petrified.

33.     Not knowing what to do, Ms. Hughes-Quain allowed Defendant Scott to come into her apartment at his request. Although she does not recall their brief conversation, Ms. Hughes-Quain recalls that Defendant Scott came in and sat on her couch. Ms. Hughes-Quain sat on the opposite end of the couch.

34.     Defendant Scott then indicated that they should move to Ms. Hughes-Quain's bedroom. Ms. Hughes-Quain is about ten years younger than Defendant Scott.

35.     Ms. Hughes-Quain was supporting herself without the assistance of her parents. VFCU was paying for part of her college tuition. Ms. Hughes-Quain could not afford to lose her job or the benefits she received as a teller at VFCU.

36.     As such, Ms. Hughes-Quain felt compelled to agree to Defendant Scott, and the two of them entered her bedroom.

37.     Defendant Scott had Ms. Hughes-Quain lay on the bed.

38.     Ms. Hughes-Quain recalls just laying on the bed and wanting the ordeal to be over while Defendant Scott raped her without a condom.

6

39. Once the assault was over, Ms. Hughes-Quain rolled off the bed and cried on the floor of the bedroom.

40. Ms. Hughes-Quain told Defendant Scott to "get the fuck out of the house."

41. Before leaving, Defendant Scott kissed Ms. Hughes-Quain against her will.

42. After Defendant Scott let himself out of the apartment, Ms. Hughes-Quain locked the door.

43. Ms. Hughes-Quain went to her bathroom and climbed into the bathtub. Ms. Hughes-Quain let the shower run while she cried. Afterwards, she tried to sleep but she kept waking up as she relived the horrible assault.

## IV.   CONTINUED AND RELENTLESS HARASSMENT AND FURTHER ASSAULT BY MR. SCOTT

44. The morning after the sexual assault, Ms. Hughes-Quain went for a run. As she did so, she was petrified. Ms. Hughes-Quain feared that Defendant Scott may appear again. She was constantly looking over her shoulder.

45. Later that morning, Ms. Hughes-Quain went to work at the Credit Union.

46. While Ms. Hughes-Quain was at work, she received a flower delivery. There was no card and her colleagues at work assumed that the flowers were from her boyfriend. Disgustingly though, Defendant Scott sent the flowers as if Ms. Hughes-Quain was a willing participant in the prior night's encounter.

47. Defendant Scott walked by the teller line and nodded and winked at Ms. Hughes-Quain.

48. As soon as her shift ended, Ms. Hughes-Quain took the flowers and threw them in the dumpster because she could not stand the reminder of Defendant Scott's attack from the previous night.

49.     Defendant Scott continued his harassment of Ms. Hughes-Quain.  On several more occasions, Defendant Scott appeared at Binghamton University to see Ms. Hughes-Quain.

50.     Ms. Hughes-Quain frequently asked her classmate to walk her to her car so that there was no risk of being alone with Defendant Scott.  Defendant Scott talked to Ms. Hughes-Quain and tried to engage with her, but Ms. Hughes-Quain made excuses about studying or grabbing coffee with friends.

51.     Unrelenting, Defendant Scott continued to stalk Ms. Hughes-Quain.  He found out that Ms. Hughes-Quain worked out at the IBM gym.

52.     Defendant Scott started going to the IBM gym and waiting for Ms. Hughes-Quain in the parking lot.

53.     Defendant Scott would accost Ms. Hughes-Quain once she came out of the gym and ask that she accompany him.

54.     Ms. Hughes-Quain typically went to the gym while her boyfriend went to the shooting range within walking distance.  One night in June 1988, Ms. Hughes-Quain's boyfriend was not present, but Defendant Scott was outside the gym parking lot waiting for Ms. Hughes-Quain.  Defendant Scott approached Ms. Hughes-Quain, and she said she was going home and asked that Defendant Scott leave her alone.

55.     Rather than listen to Ms. Hughes-Quain and accept that she was not interested in him, Defendant Scott followed her to her apartment unbeknownst to Ms. Hughes-Quain.  After she got home, Defendant Scott knocked on her door.

56.     Ms. Hughes-Quain was frozen with fear.

57.     Defendant Scott stated that he wanted to see how she was doing, and he let himself into her apartment.

8

58.     Defendant Scott immediately began groping Ms. Hughes-Quain, and he raped Ms. Hughes-Quain for a second time in her home, this time on the couch in the living room.

59.     When Defendant Scott was finished with his sexual assault, Ms. Hughes-Quain pushed him off of her and told him he needed to go and that he needed to leave her alone.

60.     Ms. Hughes-Quain stated that she did not want to see Defendant Scott again.

61.     Just one week later, Defendant Scott again appeared at Ms. Hughes-Quain's apartment and sought entry.

62.     Ms. Hughes-Quain yelled through the door for Defendant Scott to leave her alone. Defendant Scott responded back and told her that he brought her ice cream and asked that she let him in.  Ms. Hughes-Quain again demanded that he leave, and this time, Defendant Scott complied.

63.     In July 1988, on a weekend, Defendant Scott appeared in the parking lot of the IBM gym and waited for Ms. Hughes-Quain.  Defendant Scott approached Ms. Hughes-Quain, and she again demanded that Defendant Scott leave her alone.

64.     Ms. Hughes-Quain stated that she would tell her boyfriend that Defendant Scott was harassing her and that she would report him at work.  Ms. Hughes-Quain then got into her car and left.

65.     Later that afternoon, Defendant Scott called Ms. Hughes-Quain at home.  When she answered the phone and heard Defendant Scott's voice, she hung up on him.  Defendant Scott then called her at home repeatedly that day.  Ms. Hughes-Quain's boyfriend was at her apartment later in the day, and he asked Ms. Hughes-Quain why her phone kept ringing.  Ms. Hughes-Quain advised her boyfriend that a man at work was harassing her.  When the phone rang again, Ms. Hughes-Quain's boyfriend answered the phone and told Defendant Scott that he

9

better leave Ms. Hughes-Quain alone or that he would break Defendant Scott's legs.  Defendant

Scott stopped calling Ms. Hughes-Quain for the remainder of the weekend.

66.     The following Monday morning, however, Defendant Scott called Ms. Hughes-

Quain again at home.  When she answered the phone, Defendant Scott asked her not to hang up

and stated that he just wanted to check in with her because her boyfriend sounded angry on the

phone over the weekend when he spoke to Defendant Scott.  Ms. Hughes-Quain again advised

Defendant Scott to leave her alone.

## V.     MS. HUGHES-QUAIN REPORTS MR. SCOTT'S ASSAULT AND HARASSMENT TO HER BRANCH MANAGER AND HUMAN RESOURCES

67.     At the urging of her boyfriend, Ms. Hughes-Quain reported Defendant Scott's

assaults and harassment to her branch manager, Joan Felice.

68.     As Ms. Hughes-Quain told Ms. Felice about Defendant Scott's conduct, Ms.

Felice stopped Ms. Hughes-Quain and advised that they needed HR involved.

69.     Ms. Hughes-Quain and Ms. Felice went to the Vice President ("VP") of HR, and

Ms. Hughes-Quain recounted everything Defendant Scott had done to her – from the stalking at

Binghamton University to being raped at her home.

70.     The VP of HR took notes during Ms. Hughes-Quain's account of the events.

71.     Ms. Hughes-Quain was crying as she detailed the trauma which Defendant Scott

inflicted upon her.

72.     During the meeting, Ms. Felice held Ms. Hughes-Quain's hand because she was

so emotional.

73.     At the end of the meeting, the VP of HR advised Ms. Hughes-Quain to go home

and that they would contact Ms. Hughes-Quain once Ms. Felice and the VP of HR had an

opportunity to discuss the information with the Credit Union's leadership.

74.     Ms. Hughes-Quain left VFCU, but she did not feel safe returning to her apartment because Defendant Scott knew where she lived.  Instead, she was forced to stay at her parents' house.  Because Ms. Hughes-Quain was independent and supporting herself, Ms. Hughes-Quain's parents knew something was wrong, but they did not know exactly what the issue was.

## VI.    MS. HUGHES-QUAIN RETURNS TO WORK AND MR. SCOTT'S HARASSMENT CONTINUES

75.     Within one week, VFCU asked Ms. Hughes-Quain to return to work.  When Ms. Hughes-Quain was set to return, VFCU asked Defendant Scott to take a few weeks of vacation.

76.     Defendant Scott did take the time off.

77.     Ms. Hughes-Quain did not return to work at the Endicott branch.  Instead, she was moved to the branch at the IBM facility which was only accessible to IBM and VFCU employees.  These positions were typically reserved for senior employees or family members of IBM or the Credit Union's executives.  HR advised Ms. Hughes-Quain that they would instruct Defendant Scott that he was not to interact with or bother her.

78.     At first, Ms. Hughes-Quain was happy to be free from the harassment of Defendant Scott.

79.     The harassment-free period, however, was short lived.  Within a matter of weeks, Defendant Scott began appearing at Ms. Hughes-Quain's new branch.  He would frequently walk past Ms. Hughes-Quain's desk in an obviously threatening and intimidating manner.

80.     Defendant Scott's presence alone made Ms. Hughes-Quain extremely uncomfortable.

81.     In August 1988, Defendant Scott appeared at the IBM branch and stopped to talk with someone right in front of Ms. Hughes-Quain.  While Defendant Scott was talking with this

other employee, he was staring directly at Ms. Hughes-Quain. Ms. Hughes-Quain feared for her safety and could not continue to work at VFCU.

82. As a result, Ms. Hughes-Quain stood up and directly went to her manager and advised that she was quitting, effective immediately. Although the Credit Union was aware of exactly what Defendant Scott put Ms. Hughes-Quain through, they continued to subject her to his harassment and inappropriate conduct.

83. Defendant VFCU and Defendant Scott, pursuant to the applicable laws, are directly liable for Defendant Scott's conduct, who was Ms. Hughes-Quain's superior at work.

## VII. YEARS LATER, MR. SCOTT CALLOUSLY DISREGARDS MS. HUGHES-QUAIN

84. More than a decade later, Ms. Hughes-Quain crossed paths with Defendant Scott again. At the time, both served as Chief Information Officer of their respective employers.

85. During a meeting between their employers, Ms. Hughes-Quain had a chance meeting with Defendant Scott. When she saw him, she got sick to her stomach. Ms. Hughes-Quain could not stand to see Defendant Scott or hear his voice. She had to excuse herself from the room and the meeting ended.

86. The meeting was rescheduled for a few days later. At that time, Defendant Scott told Ms. Hughes-Quain that he did not appreciate her walking out of the meeting and demanded that she show him respect.

87. Ms. Hughes-Quain was shocked and asked how Defendant Scott could say that after what he had put her through years earlier.

88. Defendant Scott callously stated that whatever happened in the past was "water under the bridge." Defendant Scott also said that Ms. Hughes-Quain needed to show him the "respect" that he deserved or she and her company would not get the contract with his company.

12

89.     Ms. Hughes-Quain was shocked and appalled and walked away from Defendant Scott.

90.     Ms. Hughes-Quain has not seen Defendant Scott since that meeting.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

91.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the each of the preceding paragraphs as if fully set forth herein.

92.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by denying her the same benefits, terms and conditions of employment as those which are provided to men.

93.     Defendants' conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's sex.

94.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief to the greatest extent permitted by law, in addition to reasonable attorney's fees and expenses.

95.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

96.     Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against All Defendants*

97.     Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

98.     By the actions described above, among others, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL by engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

99.     VFCU's and Scott's conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's engagement in protected activities.

100.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

101.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

102.    Defendants' unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
**(Aiding and Abetting Unlawful Discrimination and Retaliation in Violation of the NYSHRL)**
***Against Defendant Scott***

103.    Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

104.    By the actions described above, among others, Defendant Scott knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

105.    As a direct and proximate result of Defendant Scott unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

106.    Defendant Scott's unlawful actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
**(Negligence)**
***Against Defendant VFCU***

107.    Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

108.    Defendant VFCU's conduct described herein, including, but not limited to, the negligent retention, training, discipline and/or supervision of Defendant Scott, failure to provide adequate security or a safe environment, as well as affirmative acts covering up and empowering

Defendant Scott to commit sexual assaults against Plaintiff, resulted in his commission of such assaults against Plaintiff.

109.    Defendant VFCU knew or reasonably should have known that Defendant Scott regularly engaged in sexual misconduct and would use his position with Defendant VFCU to sexually pressure and commit sexual misconduct against Plaintiff.

110.    Defendant VFCU's acts covering up Defendant Scott's sexual misconduct created a continuing risk of Defendant Scott engaging in similar sexual misconduct or intimidation against those who refused his advances, but the Company nonetheless allowed Defendant Scott to have the authority, opportunities and resources to engage in sexual misconduct with female employees and knew or should have known that Defendant Scott engaged in sexual misconduct and/or that Defendant Scott had the temptation or opportunity to engage in sexual misconduct.

111.    Defendant VFCU had a duty of care to properly hire, train, retain/terminate, supervise and/or discipline their employees and executives (including Defendant Scott) to avoid unreasonable harm to others or to take steps to alleviate harm caused by Defendant Scott's conduct.

112.    Defendant VFCU breached its duty of care by way of its own conduct as alleged herein, including, but not limited to, taking steps to warn or otherwise reduce the risk that Defendant Scott posted to Plaintiff and/or that he would use his position of power to engage in sexual misconduct with Plaintiff due to his position at VFCU.

113.    Defendant VFCU showed substantial negligence in the negligent hiring, retention and supervision of Defendant Scott, allowing him to abuse his power to commit sexual misconduct against Plaintiff and also in failing to protect Plaintiff from retaliation and/or intimidation once she complained about Defendant Scott's misconduct.

114.    Defendant VFCU knew or was negligent or recklessly indifferent to the harm that Defendant Scott inflicted on Plaintiff by using his position of power to engage in sexual misconduct, and Defendant VFCU reasonably and foreseeably did know or should have known that Defendant Scott would engage in such conduct and inflict harm on Plaintiff.

115.    Defendant VFCU's negligent conduct in relation to Defendant Scott's propensity to engage in sexual misconduct towards Plaintiff was a substantial factor in causing Plaintiff's harm.

116.    As a direct and proximate result of Defendant VFCU's negligence conduct, and as a direct and proximate result Defendant VFCU failing to address Defendant Scott's use of his power to engage in sexual misconduct, Plaintiff has suffered physical injury, severe mental and emotional distress, humiliation, embarrassment, anxiety and economic harm.

117.    This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

**FIFTH CAUSE OF ACTION**
**(Assault/Sexual Assault)**
***Against Defendant Scott***

118.    Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

119.     As described above, Defendant Scott frightened and placed Plaintiff in apprehension of harm when he physically and sexually assaulted her on multiple occasions within the State of New York.

120.     Defendant Scott forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touch her with his own intimate body parts.

121.     As a result of Defendant Scott's conduct, Plaintiff has suffered, and continues to suffer, harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

122.     The conduct of Defendant Scott described above was willful, wanton and malicious.  At all relevant times, Defendant Scott acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff's, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of the forgoing, Plaintiff is entitled to recover punitive damages.

123.     This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

### SIXTH CAUSE OF ACTION
**(Battery/Sexual Battery)**
***Against the Defendant Scott***

124.     Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

18

125.    As described above, Defendant Scott engaged in the sexual assaults and misconduct as described above without Plaintiff's consent and against her will, committing multiple batteries against Plaintiff because he intentionally engaged in unlawful, intentional and offensive touching or application of force to Plaintiff's person.

126.    As a direct and proximate result of Defendant Scott's conduct, Plaintiff has suffered, and continues to suffer, physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

127.    The conduct of Defendant Scott described above was willful, wanton and malicious.  At all relevant times, Defendant Scott acted with conscious disregard for Plaintiff's rights, welfare, and consent, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the forgoing, Plaintiff is entitled to recover punitive damages.

128.    This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

### SEVENTH CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress)**
***Against All Defendants***

129.    Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

130.     The Defendants' conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Defendants knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

131.     Plaintiff's emotional distress was foreseeable to Defendants.

132.     As a direct and proximate result of the negligent conduct of Defendants, Plaintiff suffered and will continue to suffer severe emotional distress.

133.     Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to punitive damages.

134.     This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

### EIGHTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**
***Against All Defendants***

135.     Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

136.     Defendants engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia,* subjecting her to repeated sexual assaults and misconduct over the course of her employment with VFCU.

137.     The sexual assaults and misconduct by Defendants were extreme and outrageous conduct that shocks the conscience.

138.     By the actions described above, Defendant VFCU knowingly allowed Defendant Scott's conduct to continue unabated throughout Plaintiff's time with VFCU.

20

139.     These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

140.     As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

141.     Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to punitive damages.

142.     This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York;

B.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.      An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 16, 2023
     New York, New York

             **WIGDOR LLP**

             By: _____
                 Michael J. Willemin
                 Sagar K. Shah*
                 *(*pro hac vice* motion to be filed)

             85 Fifth Avenue
             New York, NY 10003
             Telephone: (212) 257-6800
             Facsimile: (212) 257-6845
             mwillemin@wigdorlaw.com
             sshah@wigdorlaw.com

             *Attorney for Plaintiff*